2012 ND 123

**Erling "Curly" HAUGLAND, Plaintiff, Appellant and Cross–Appellee,**

v.

**CITY OF BISMARCK, Defendant, Appellee and Cross–Appellant.**

No. 20110077.

Supreme Court of North Dakota.

July 6, 2012.

Monte L. Rogneby, Bismarck, N.D., for plaintiff, appellant and cross-appellee.

Randall J. Bakke (argued) and Shawn A. Grinolds (appeared), Bismarck, N.D., for defendant, appellee and cross-appellant.

SANDSTROM, Justice.

[¶ 1] Erling "Curly" Haugland appeals and the City of Bismarck cross-appeals from a summary judgment declaring North Dakota's Urban Renewal Law, N.D.C.C. ch. 40–58 ("the Act"), is not un-

constitutional and Bismarck's implementation of an urban renewal plan and use of tax increment financing to fund urban renewal projects in its urban renewal area complies with the Act. Haugland claims the Act violates the gift clause provisions of N.D. Const. art. X, § 18, the requirements for imposing taxes in N.D. Const. art. X, §§ 3 and 5, and the equal protection provisions of the state and federal constitutions. He also claims Bismarck's implementation of a perpetual urban renewal plan violates the Act. We hold the Act is constitutional, but the summary judgment record in this case does not establish whether Bismarck's renewal plan complies with the provisions of the Act. We affirm in part, reverse in part, and remand for further proceedings.

I

[¶ 2] Haugland's lawsuit raises issues about Bismarck's implementation of an urban renewal plan under the Act and use of tax increment financing under the renewal plan to fund renewal projects within its downtown renewal area. *See* N.D.C.C. § 40–58–01.1(7)–(9) (defining "development or renewal area" as industrial or commercial property, slum or blighted area, or a combination of those properties or areas designated by a municipality as appropriate for a development or renewal project; defining "development or renewal plan" as a sufficiently complete plan for a development or renewal project which conforms to the municipality's general plan; and defining "development or renewal project" to include authorized undertakings in a renewal area for development of industrial or commercial properties or for elimination and prevention of the development or spread of slums and blight) and N.D.C.C. § 40–58–20 (outlining procedure for tax increment financing). To understand those issues, we briefly outline the statutory framework of the Act and Bismarck's implementation of its urban renewal plan under the Act, which generally authorizes a municipality to use private enterprise and public resources, including tax increment financing, to pay for the development, rehabilitation, or redevelopment of a renewal area under a renewal plan. *See* N.D.C.C. §§ 40–58–03 and 40–58–20.

[¶ 3] Section 40–58–04, N.D.C.C., authorizes a municipality to use private and public resources to facilitate the development of industrial or commercial properties, to eliminate and prevent the development or spread of slums and urban blight, and to rehabilitate slum and blighted areas by encouraging voluntary rehabilitation and by compelling repair of deteriorated or deteriorating structures and redevelopment of those areas. Section 40–58–01.1(14), N.D.C.C., defines "industrial or commercial property" to mean "unused or underutilized real property that is zoned or used as an industrial or commercial site." Section 40–58–01.1(23), N.D.C.C., defines a "slum area" to mean:

an area in which there is a predominance of buildings or improvements, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of these factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime, and is detrimental to the public health, safety, morals, or welfare.

Section 40–58–01.1(2), N.D.C.C., defines a "blighted area" to mean:

an area other than a slum area which by reason of the presence of a substantial number of slums, deteriorated or deteriorating structures, predominance

of defective or inadequate street layout, faulty lot layout in relation to size, adequacy, accessibility, or usefulness, unsanitary or unsafe conditions, deterioration of site or other improvements, diversity of ownership, tax or special assessment delinquency exceeding the fair value of the land, defective or unusual conditions of title, improper subdivision or obsolete platting, or the existence of conditions which endanger life or property by fire and other causes, or any combination of these factors, substantially impairs or arrests the sound growth of a municipality, retards the provision of housing accommodations or constitutes an economic or social liability and is a menace to the public health, safety, morals, or welfare in its present condition and use.

[¶ 4] A municipality has "all the powers necessary or convenient" to effectuate the purposes of the Act, including the authority to adopt, modify, and amend necessary renewal plans and to undertake and carry out renewal projects within its area of operation for voluntary or compulsory repair and rehabilitation of buildings and improvements in connection with renewal projects; to appropriate funds, make expenditures, and levy taxes necessary to carry out the purposes of the Act; to make and execute contracts necessary or convenient to exercise its powers under the Act; and to acquire, deal with, and dispose of property in a renewal area. *See* N.D.C.C. §§ 40–58–07 (describing municipality's powers), 40–58–09 (authorizing municipality to dispose of property in renewal area), and 40–58–18 (authorizing municipality to adopt ordinance for repair, closing, and demolition of dwellings unfit for human habitation).

[¶ 5] Before exercising any of its powers under the Act, a municipality must adopt a resolution finding one or more slum or blighted areas or industrial or commercial properties exist in the municipality and the development, rehabilitation, conservation, or redevelopment of the area or properties is necessary in the interest of the public economy, health, safety, morals, or welfare of the municipality's residents. N.D.C.C. § 40–58–05. The Act outlines the requirements for a municipality to approve a resolution for adoption of a renewal plan and includes a procedure for modifications of a renewal plan that substantially change a previously approved plan. N.D.C.C. § 40–58–06.

[¶ 6] The Act authorizes a municipality to use tax increment financing under N.D.C.C. § 40–58–20 to pay for development or renewal of the renewal area under the renewal plan and any modifications of the plan. When tax increment financing is used to pay for development or renewal of the renewal area, the county auditor ascribes two taxable values to each lot and parcel of land in the renewal area—an original taxable value when the municipality requests the auditor to compute and certify that value and a subsequent taxable value based upon the net amount the original taxable value has increased or decreased as a result of renewal of the area under the renewal plan and any modifications. *See* N.D.C.C. § 40–58–20(1)–(3). The net amount of the increase or decrease is the incremental value or lost value. N.D.C.C. § 40–58–20(3). An owner of property in a renewal area pays property taxes based on the redeveloped taxable value of the land. *See* N.D.C.C. § 40–58–20(2)–(5). The property tax attributable to the original taxable value of each lot and parcel is distributed to the normal property tax recipients, including the park district, the school district, and the county, and the property tax attributable to any incremental increased taxable value is diverted from those normal recipients to the municipality to pay for renewal

projects "until the cost of development or renewal of the area has been reimbursed" to the municipality. *See* N.D.C.C. § 40–58–20(4) and (7). Section 40–58–20(10), N.D.C.C., also describes a procedure to be employed when the cost of renewal of any renewal area has been fully paid and all obligations to pay the cost have been retired, or the municipality has received sufficient funds to retire its obligations.

[¶ 7] Here Haugland's complaint alleges Bismarck adopted its renewal plan in January 1979 and substantially modified the plan in December 1979, July 1984, June 1988, November 1994, October 2006, and March 2010. This record reflects that at a Bismarck City Commission meeting in December 1978, Bismarck adopted a resolution to amend a previously approved renewal plan. The resolution stated the described area of about 14 downtown city blocks "consists of a combination of slum and blighted areas" appropriate for a renewal project financed with tax increment funds. After notice and a public hearing, Bismarck approved the modified renewal plan on January 23, 1979, in a resolution directing the City Auditor to take appropriate action to obtain tax increment financing resulting from the renewal of the area to reimburse Bismarck for renewal costs. The renewal plan described the boundaries of the renewal area, objectives of the plan, proposed renewal actions, land use plans, and project proposals. The plan proposed acquisition of substandard and blighted properties, disposal, retention, or dedication of various lands for redevelopment by private or corporate developers, installation of public improvements, and rehabilitation of buildings to local standards.

[¶ 8] In December 1979, after notice and a public hearing, Bismarck modified the previously approved renewal plan to add about 35 contiguous city blocks to the renewal area. Bismarck adopted a resolu-tion stating the modified area "consists of a combination of slum and blighted areas" appropriate for a renewal area. The renewal plan again described the boundaries of the area, objectives of the plan, proposed renewal actions, land use plans, and project proposals. The plan explicitly listed several items for acquisition and construction, including public parking on Block 44, restoration and acquisition of the Burlington Northern Depot, overhead walkway between parkade and adjacent structures, addition of two stories to a parkade, rehabilitation and removal of structures as recommended and approved by the City, and federally assisted low income elderly housing on part of one block in the renewal area.

[¶ 9] In July 1984, after notice and a public hearing, Bismarck modified its urban renewal plan to add about 17 contiguous city blocks, including the Bismarck Civic Center, to the renewal area. Bismarck's resolution modifying the renewal plan identified the prior resolutions and stated Bismarck has determined the prior renewal area and the additional area "consist of a combination of slum and blighted areas." The renewal plan described the boundaries of the area, objectives of the plan, proposed renewal actions, land use planning, and project proposals. The plan generally listed the same proposed renewal actions from the December 1979 plan and also listed the same items for acquisition and construction in the revised area as listed in the December 1979 plan.

[¶ 10] In June 1988, after notice and a public hearing, Bismarck modified its renewal plan to authorize use of tax increment funds to pay for improvements to the Bismarck Civic Center and Exhibition Hall and for improvements to the Chancellor Square Pedestrian Mall. The plan generally identified the same items for acquisition and construction as the earlier plans and

added specific language for the addition of seating and exhibit space for the Bismarck Civic Center and for renovations for the Chancellor Square Pedestrian Mall.

[¶ 11] In August 1994, after notice and a public hearing, Bismarck considered a proposal to modify its renewal area to include an additional contiguous area. Haugland appeared at the Bismarck City Commission meeting and protested the proposed modification of the plan, claiming all debt for the previously approved plan had been paid and the plan must be discontinued. Bismarck sought an Attorney General's opinion, asking if "N.D.C.C. § 40–58–20(10) requires a city to remove an individual parcel from ... an urban development or renewal area after any tax increment-financed improvements to the specific parcel have been individually completed and any tax increment-financed obligations with respect to such parcels have been repaid." The Attorney General opined "that N.D.C.C. § 40–58–20(10) does not authorize a city to remove individual parcels from an urban development or renewal area after tax increment-financed improvements to the specific parcel have been individually completed and paid." N.D. Op. Att'y Gen. 94–L–282, Oct. 17, 1994. After a continued public hearing in November 1994, Bismarck modified its renewal plan to add about six additional contiguous city blocks to the renewal area. The 1994 modified plan generally identified the same proposed renewal actions as the earlier plans and identified the same items for acquisition and construction within the renewal area.

[¶ 12] In January 2007, after notice and a public hearing, Bismarck adopted a resolution to modify its renewal plan to include additional contiguous area. Bismarck's resolution approving the modified plan stated Bismarck had determined the prior renewal area and the additional area "consist of a combination of slum and blighted areas." As modified, the renewal area included about 88 contiguous city blocks in downtown Bismarck. The modified plan, dated October 24, 2006, identified the same specific items as the earlier plans for acquisition and construction within the renewal area and also identified the creation of a program to encourage private investment in the core of the community, including facade and signage incentive grants, housing incentive grants, technical assistance, revolving loan funds, sidewalk subsurface infill, downtown streetscape elements, skyway development, and a quiet rail zone. A brochure describes the CORE Incentive Programs as a program:

to encourage rehabilitation, reinvestment, and new development in the downtown area of our community. These programs were created to stimulate new development in the downtown area and fund projects that will serve as the foundation for future downtown development and a healthy tax base. These incentive programs are funded by the Downtown Tax Increment District and are available to property owners, developers, and tenants for projects within that District. All CORE Incentive Program grants and awards are discretionary and will be considered on a case-by-case basis. [The] Facade and Signage Grant ... program ... provides 50% matching funds for improvements made to building facades, signs, and awnings. [The] Housing Incentive Grant ... program provides 20% matching grants for the creation or rehabilitation of housing units within the downtown area[. The] Technical Assistance Bank ... offers financial assistance for professional design services from licensed architects and engineers. [The] Revolving Loan Fund ... provides loans at reduced interest rates for projects within the downtown area and is funded jointly by the City's tax increment fund

and participating financial institutions. [The] Sidewalk Subsurface Infill ... program offers grants for work within the public right-of-way needed to fill subsurface vaults under sidewalks.

[¶ 13] In March 2010, during a public hearing, Bismarck again modified its urban renewal plan to move the outer boundary of the renewal area from the center line of the perimeter streets of the renewal area to the outside edge of those streets. As relevant to the issues in this case, Bismarck's March 2010 action did not otherwise add any property to the renewal area.

[¶ 14] In May 2010, Haugland sued Bismarck, seeking a declaration that Bismarck's adoption and modifications of its renewal plan and use of tax increment financing to fund renewal projects in its renewal area violated N.D.C.C. ch. 40–58, the gift clause provisions of N.D. Const. art. X, § 18, the requirements for imposing taxes in N.D. Const. art. X, §§ 3 and 5, and the equal protection provisions of N.D. Const. art. I, §§ 21 and 22, and the federal constitution.

[¶ 15] Haugland claimed Bismarck's renewal plan created an illegal and perpetual downtown renewal area, which continues to keep redeveloped property within the renewal area as a resource for completion of the plan as a whole. Haugland alleged that when Bismarck substantially modified its plan, it failed to make findings that each parcel of property within the renewal area is a slum or blighted area or combination thereof, and that each parcel of property is appropriate for a renewal project. Haugland alleged Bismarck failed to appropriately notify the Burleigh County Auditor for inclusion of new properties within the renewal area and for removal of redeveloped properties from the area, which resulted in an illegal perpetual renewal area and permitted Bismarck to collect tax increment funds from non-blighted and non-slum properties at the expense of the lawful recipients of the property taxes, including the Bismarck School District, the Bismarck Park Board, and Burleigh County. Haugland claimed the original taxable values of properties within the renewal area were not properly adjusted as required by law when Bismarck's renewal plan was modified. Haugland also claimed Bismarck retained excess tax increment funds not necessary for any properly approved renewal project and had collected and illegally retained $15,125,605 in excess tax increment funds as of December 31, 2009, which Bismarck purported to use for future renewal projects that had not been properly adopted. Haugland also claimed Bismarck improperly used excess tax increment funds for its "CORE Incentive Program," which resulted in gifts to some property owners within the renewal area for facade and signage, housing incentives, technical assistance, revolving loans, and payments for subsurface infill of vaults below the public right-of-way within the renewal area.

[¶ 16] Bismarck denied Haugland's claims and moved for judgment on the pleadings, or alternatively, for summary judgment. Haugland resisted Bismarck's motion and also moved under N.D.R.Civ.P. 56(f) for time to conduct additional discovery. The district court considered documents outside the pleadings and treated Bismarck's motion as a request for summary judgment. The court granted Bismarck summary judgment, ruling the Act was not unconstitutional, there were no disputed issues of material fact, and Bismarck's renewal plan complied with N.D.C.C. ch. 40–58. A judgment dismissing Haugland's claims was entered in January 2011.

[¶ 17] The district court had jurisdiction under N.D.C.C. § 27–05–06 and N.D. Const. art. VI, § 8. Haugland's appeal and

Bismarck's cross-appeal are timely under N.D.R.App.P. 4(a)(1) and (2). This Court has jurisdiction under N.D.C.C. § 28–27–01 and N.D. Const. art. VI, §§ 2 and 6.

II

[¶ 18] Haugland has moved under N.D.R.App.P. 10(h) and N.D.R.Ev. 201(d) to supplement the record on appeal to include the minutes from a Bismarck City Commission meeting on September 13, 2011, and for this Court to take judicial notice of Bismarck's determination that it has excess tax increment funds under the current provisions of N.D.C.C. § 40–58–20(12). *See* 2011 N.D. Sess. Laws ch. 300, §§ 2 and 3 (amending provisions of N.D.C.C. §§ 40–58–20(1) and adopting 40–58–20(12)).

[¶ 19] Rule 10(h), N.D.R.App.P., applies when the record does not truly disclose what occurred in the district court, or when there are omissions from or misstatements of the record in the district court. Haugland's motion involves matters arising after the January 2011 judgment was entered in this action. Those matters generally are not within the purview of N.D.R.App.P. 10(h), and we deny Haugland's motion.

III

[¶ 20] In its cross-appeal, Bismarck argues the district court erred in not granting Bismarck's motion for judgment on the pleadings under N.D.R.Civ.P. 12. Bismarck claims the case involves only matters of public record and should have been decided on the pleadings.

[¶ 21] Under N.D.R.Civ.P. 12, when matters outside the pleadings are presented to and not excluded by the district court, the motion must be treated as one for summary judgment. *Davidson v. State*, 2010 ND 68, ¶ 11, 781 N.W.2d 72. Although the resolution of this case may involve some matters of public record, Bis-

marck's motion included an affidavit and matters outside the pleadings. We conclude the district court did not err in treating Bismarck's motion under the standards for summary judgment, which is a procedural device for promptly resolving a controversy on the merits without a trial if there are no disputed issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *See Davidson*, at ¶ 11.

IV

[¶ 22] Haugland argues Bismarck's use of tax increment financing for renewal projects under the Act constitutes a gift of public money to private parties in violation of N.D. Const. art. X, § 18, which he claims prohibits Bismarck from gifting tax money to private property owners unless Bismarck receives fair consideration for the transfer, or unless the transfer is part of a legitimate for-profit business enterprise operated by Bismarck. He asserts Bismarck's renewal plan is unconstitutional under N.D. Const. art. X, § 18, because Bismarck is gifting property to private entities for something that is not an enterprise and not a public purpose. He claims Bismarck's perpetual renewal plan and disbursements do not promote the contentment of *all* Bismarck's inhabitants, because only the property owners within the renewal area are beneficiaries of the plan. Bismarck responds the Act is not unconstitutional, because any disbursed funds for renewal projects are used to encourage private investment in the renewal area, which Bismarck claims is an "enterprise" for a public purpose within the meaning of N.D. Const. art X, § 18.

[¶ 23] In considering whether the Act violates N.D. Const. art. X, § 18, we start with the principle that statutory enactments are presumed to be constitutional

unless the statutory scheme is clearly shown to contravene the state or federal constitution. *See, e.g., North Dakota Council of Sch. Adm'rs v. Sinner,* 458 N.W.2d 280, 285 (N.D.1990). We also have said the "state constitution is not a grant but a limitation on legislative power, so that the legislature may enact any law not expressly or inferentially prohibited" by the state or federal constitution. *Northwestern Bell Tel. Co. v. Wentz,* 103 N.W.2d 245, 252 (N.D.1960).

[¶ 24] Article X, § 18, N.D. Const., currently provides:

The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by article XX of the constitution, but neither the state nor any political subdivision thereof shall otherwise loan or give its credit or make donations to or in aid of any individual, association or corporation except for reasonable support of the poor, nor subscribe to or become the owner of capital stock in any association or corporation.

[¶ 25] In interpreting constitutional provisions, we apply general principles of statutory construction. *Thompson v. Jaeger,* 2010 ND 174, ¶ 7, 788 N.W.2d 586. Our overriding objective is to give effect to the intent and purpose of the people adopting the provision. *City of Bismarck v. Fettig,* 1999 ND 193, ¶ 8, 601 N.W.2d 247. The intent and purpose of a constitutional provision is to be determined, if possible, from the language itself. *Thompson,* at ¶ 7. We give words in a constitutional provision their plain, ordinary, and commonly understood meaning. *Id.* We give effect and meaning to every provision and reconcile, if possible, apparently inconsistent provisions. *Id.*

[¶ 26] To ascertain the meaning of the current language of N.D. Const. art. X, § 18, we trace the historical development of that provision. As originally adopted by the people in 1889, the "gift" clause provision precluded the State and political subdivisions from making a "loan," giving its "credit," or making "donations" to any individual, association or corporation, except for necessary support of the poor:

Neither the State nor any county, city, township, town, school district or any other political subdivision shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation, nor shall the State engage in any work of internal improvement unless authorized by a two-thirds vote of the people.

N.D. Const. art. XII, § 185 (1889).

[¶ 27] The people originally adopted Section 185 to prohibit the State or a political subdivision from making donations or giving or loaning credit to aid in the construction of railroads or other internal improvements. *See Erskine v. Steele County,* 87 F. 630, 635 (C.C.D.N.D.1898), *aff'd Steele County v. Erskine,* 98 F. 215, 219 (8th Cir.1899); *State ex rel. Kaufman v. Davis,* 59 N.D. 191, 210, 229 N.W. 105, 112 (1930). In *State v. Nelson County,* 1 N.D. 88, 89–90, 45 N.W. 33 (1890), this Court interpreted the original language in Section 185 in the context of a statute authorizing counties to provide aid to farmers to buy seed grain. This Court described the historical background for Section 185 and held it did not preclude the legislature from enacting a statute authorizing counties to provide aid to poor and destitute farmers to buy seed grain:

That section is not only restrictive upon counties, but is also permissive. It permits counties to lend aid for "the necessary support of the poor." To our mind, the restrictive words of that section were intended to prevent the loan of aid

either to individuals or corporations, for the purpose of fostering business enterprises, either of a public or private nature; but that the people who adopted the constitution, as well as those who framed the instrument, expressly intended by the language of that section to grant a power affirmatively to the municipal corporations named in section 185, to lend their aid and make donations for the "necessary support of the poor." The attention of the court has been directed to the constitutions of 19 of the states, in which the language of section 185 is used verbatim, except only that in the states of North and South Dakota the words above quoted are interpolated. Why was this peculiar language introduced into the constitutions of North and South Dakota, when nothing of the kind was found in that of the other 17 states? Why did not the conventions which formed the organic law for North and South Dakota simply copy the language which, with this exception, is borrowed from the other constitutions, without inserting the excepting clause under consideration? To our mind, the answer to these questions is found in the peculiar and alarming condition of the people of Dakota territory in the year 1889, when the two Dakotas assumed the responsibilities of statehood. Such conditions had not before existed, and hence the constitutions of other states had made no provisions to meet such necessities. When the two states formed and adopted their constitutions the fact was well known and recognized by the people of Dakota that the condition of many farming communities was such that some comprehensive measure for their relief was an imperative necessity. In such a conjuncture the words were interpolated into section 185 of the constitution, which permit counties to loan their aid for the "necessary support of the poor." No constitutional grant of power was necessary to give the new governments authority to provide for the support of paupers in the poor-houses. That power is inherent, and exists in all governments as among their implied powers and duties. By universal consent, taxes are valid when laid for the support of paupers, or those likely to become paupers. There was no necessity and no reason for inserting a provision in the state constitutions of North and South Dakota authorizing counties to loan their aid to maintain the almshouses. It would be absurd to assume that the framers of the constitutions and the people who adopted them intended by this provision to enable local municipalities to issue and sell bonds, and loan the proceeds to the inmates of the poorhouses; yet the power to loan aid in "support of the poor" is given. In our opinion, this power is conferred in the organic law expressly to meet the exigencies of the situation then existing, and that it is our duty to give it that effect. We believe, and so hold, that the class referred to in the exception contained in section 185 of the state constitution is the poor and destitute farmers of the state, and that the first legislature which met after the state was admitted has, by the seed-grain statute, put a proper construction upon the language in question. We therefore refuse to grant the writ applied for, and hold that the seed-grain statute is a valid enactment.

*Nelson County*, 1 N.D. at 99–101, 45 N.W. at 37–38.

[¶ 28] In 1914, the people amended Section 185 to authorize the state to appropriate money for the construction or improvement of public highways. *See* 1913 N.D. Sess. Laws, ch. 100; 1915 N.D. Sess. Laws, p. 403. In 1918, the people amended Section 185 to its current form to expressly authorize the state, any county, or

any city to engage in any industry, enterprise, or business not involving the manufacture or sale of intoxicating liquor, but to not otherwise loan, give its credit, or make donations to any individual, association, or corporation except for reasonable support of the poor. *See* 1919 N.D. Sess. Laws, ch. 89; 1919 N.D. Sess. Laws, p. 508.

[¶ 29] In *Wentz*, 103 N.W.2d at 253–54 (citations omitted), this Court described the historical evolution for the 1914 and 1918 amendments to Section 185 and construed the current constitutional language in the context of upholding a statute authorizing the state to reimburse utilities for costs associated with relocating their facilities for the construction of interstate highways:

> The original constitution provided that the state may engage in any work of internal improvements only if authorized by a two-thirds vote of the people. The 1914 amendment narrowed the limitation and removed the two-thirds vote requirement relative to the construction and improvement of public highways as an internal improvement. The 1918 amendment removed the limitation upon the legislature to make internal improvements. This amendment also provided that the state could undertake an adventure and engage in any industry, enterprise or business. The subsequent legislature, 1919, Laws 1919, c. 147, established the Bank of North Dakota, authorized the Commissioner of Agriculture and Labor to operate and manage a creamery for experimental purposes and to engage in activities connected with or incident to the manufacturing and marketing of dairy products, provided for the establishment of an enterprise of providing homes for its residents, under a business system named the Home Building Association of North Dakota; it established the Industrial Commission, authorizing it to conduct and manage utilities, enterprises, industries and business projects; it provided for the establishment and operation of the North Dakota Mill and Elevator Association, provided for the establishment of a Hail Insurance Department, Workmen's Compensation Bureau and County Fairs. This legislature also extended the powers and duties of the State Highway Commission and authorized it to purchase right of ways, materials and machinery for the construction of highways, provided the state may vacate any land or part thereof or right in land which has been taken or acquired for highway purposes and that such vacations would revest the title in the persons, their heirs, successors or assigns in whom it was vested at the time of the taking. Reference has been made to the passage of this legislation immediately following the ratification of the constitutional amendment as we believe it evidences the general purpose the proponents thereof advocated on its behalf.

> It is common knowledge that a state or anyone else cannot successfully engage in an industry, an enterprise or a business without in some manner being involved in a loan, the giving of its credit or the making of donations, and that in some circumstances it might be advisable to become the owner of capital stock in an association or corporation.

> Construing the language of Section 185 of the Constitution as amended its intent is perfectly clear. It first states:

> > "The state, any county or city may make internal improvements and may engage in any industry, enterprise or business, not prohibited by Article 20 of the constitution, * * *."

> The language is positive; it seems to grant a legislative power. However, its purpose is to set forth an exception to the limitation that follows.

The section then states:

"but neither the state nor any political subdivision thereof shall otherwise * * *"

and these words are followed by the words of restriction or limitation argued in this case.

The word "but" is used conjunctively in the sense of "on the contrary," and connects two clauses of the sentence in such a way as to make the last one modify or give meaning to the first, indicating that that which follows is an exception to that which has gone before. It further indicates that that which has gone before does not control that which follows.

The word "neither" is used as the negative of "either," meaning "not one nor the other." It is inclusive and imperative and includes both the state as one class and any political subdivision thereof as the other.

The word "shall" as used in constitutions and statutes is ordinarily mandatory but where it is necessary to give effect to the intent the word will be construed as "may." In this instance the word "shall" directs a negative because it is preceded by the word "neither" and provides a limitation by words that follow it upon that which has been said before, so in order to give effect to the intent of the word "shall" it must be construed as "may."

The word "otherwise" is a compound word formed by adding the suffix "wise" to the word "other", and the word "wise" when used as an adverbial suffix denotes way, manner, respect. Thus the word "otherwise" means in a different manner, in another way, or in other ways; contrarily.

The word "otherwise" refers to "may make internal improvements and may engage in any industry, enterprise or business, * * *." Therefore the limitation placed upon the legislative bodies of the governmental units named in the section does not apply to legislation for the making of internal improvements or engaging in industry, enterprise or business. This is particularly true in considering legislation providing for an onerous donation, which is one burdened with some charge imposed upon the donee and which charge has a direct relation to the internal improvement in question.

The language construed may therefore be stated as follows:

"On the contrary, the state or any political subdivision thereof may not in a different manner or in another way loan or give its credit or make donations, etc."

This is clearly the intent expressed by the language of the section when construed together. Thus it specifically exempted from its limitations internal improvements.

[¶ 30] In *Gripentrog v. City of Wahpeton*, 126 N.W.2d 230, 237–38 (N.D.1964), this Court considered a challenge to a municipality's lease of a sugar beet factory to a third party under a statutory scheme generally authorizing a municipality to engage in industrial development. This Court reiterated the interpretation of Section 185 in *Wentz* and upheld the statutory scheme authorizing a municipality to engage in industrial development, explaining:

Thus Section 185 authorizes the State and any county or city to engage directly in any industry, enterprise, or business except the business of engaging in the traffic of liquor, subject to the restrictions of the due-process clause of the Federal Constitution.

Section 185 does not prohibit the making of loans or giving of credit or making donations in connection with a city's engaging in any industry, enterprise, or

business except engaging in liquor traffic. What it does prohibit is for a city "otherwise" to make loans or give its credit or make donations. In other words, making loans or giving credit may be done in connection with the city's engaging in any permissible industry, enterprise, or business, but not otherwise.

As we said in *Northwestern Bell Telephone Co. v. Wentz* (N.D.), 103 N.W.2d 245, it is common knowledge that no one can successfully engage in an industry, enterprise, or business without in some manner being involved in lending, the giving of credit, or the making of donations. Surely the framers of Section 185 of our Constitution would not have granted to the State and to any county or city the power to engage in industry, enterprise, or business and then have denied them the right to make loans or give credit in connection with the operation of such industry, enterprise, or business.

In the case before us, the resolution of the City provides that the revenue bonds issued for such project shall not be payable from nor be a charge upon any funds other than the revenue of such project. But the City, in effect, is lending its name and its credit by contracting to perform all things necessary to enforce the provisions of the lease; that it will segregate all rents charged and collected and keep them in separate accounts and will use such rents to pay principal and interest on such bonds; and further pledges that the City will keep an accurate account and record of the entire transaction. Assuming, for the sake of argument, that this constitutes a loan or, in any event, the giving of credit, is that a violation of Section 185 of our Constitution? We think not. What the City is doing is engaging in an enterprise, the enterprise of leasing a sugar processing plant. The City is spe-cifically authorized and empowered to engage in any enterprise under the provisions of Section 185. And, in connection with its operations in engaging in this enterprise, the City is specifically authorized by Section 185 to loan or give its credit. The prohibition is against "otherwise" loaning or giving its credit or making donations to or in aid of any individual, association, or corporation.

Thus Chapter 40–57 does not violate the constitutional provision prohibiting the making of loans or extending of credit to any individual, association, or corporation, since the municipality—if there is an extension of credit involved in the actions of the City under this chapter—is, in fact, engaging in an enterprise which is specifically authorized under Section 185.

[¶ 31] In *Kelly v. Guy,* 133 N.W.2d 853, 855 (N.D.1965), this Court considered a federal constitutional challenge under the 14th Amendment to a state constitutional provision, which is now adopted in N.D. Const. art. X, § 14, and a statutory scheme, 1963 N.D. Sess. Laws ch. 206, authorizing the state to make loans to private entities to construct facilities to convert natural resources to power. This Court cited *Gripentrog* and said Section 185 authorizes the state, county, or city to engage in any industry, enterprise, or business except the business of dealing in intoxicating liquor. 133 N.W.2d at 856. This Court also cited *Gripentrog* for a "public purpose" analysis used to determine whether the use of public funds derived from taxation offended the due process clause of the 14th Amendment. *Id.* This Court said, if the state were to engage directly in the business of transmitting power from lignite generating plants to make electric power available to the consuming public, the public purpose test would be met. *Id.* This Court explained the making of a loan to further the same

purpose of generating power for the same consuming public served the same public purpose under the 14th Amendment. *Id.* In response to the plaintiffs' separate argument that Section 185 controlled the interpretation of the statutory scheme and the state constitutional provision, this Court explained the state constitutional provision relating to loans to private entities to construct facilities to convert natural resources to power was enacted after Section 185 and created an additional exception to the state's lending power. 133 N.W.2d at 857. *Kelly*, however, did not otherwise analyze a constitutional challenge to a statutory enactment under the current language of N.D. Const. art. X, § 18. *See* 133 N.W.2d at 854–59.

[¶ 32] This Court has subsequently sustained statutory provisions authorizing municipalities to engage in activities involving aspects of urban renewal and economic development. *See Patterson v. City of Bismarck*, 212 N.W.2d 374, 388 (N.D.1973) (providing parking facilities within business district being reconstructed for retail and commercial enterprise is more closely identified with functions of prosperous city than operation of a sugar beet facility in *Gripentrog* and recognizing utility of urban renewal); *City of Fargo v. Fahrlander*, 199 N.W.2d 30, 36 (N.D.1972) (construction of retail space, financing with special levies, and leasing to private entities was permissible government function under *Gripentrog* ). Our decisions discussing the historical evolution of the gift clause and interpreting the current language of N.D. Const. art. X, § 18, explicitly authorize the state or political subdivisions to engage in any industry, enterprise, or business not involving the manufacture or sale of intoxicating liquor, but to not otherwise make loans, extend credit, or make donations to any individual, association, or corporation except for the reasonable support of the poor. *Gripentrog*, 126 N.W.2d at 237–38;

*Wentz*, 103 N.W.2d at 253–54. *See Adams County Record v. Greater North Dakota Ass'n*, 529 N.W.2d 830, 836 n. 1 (N.D.1995).

[¶ 33] Under those decisions, the state or a political subdivision may make loans, extend credit, or make donations when the entity is engaged in any industry, enterprise, or business, and "[t]he prohibition is against 'otherwise' loaning or giving its credit or making donations to or in aid of any individual, association, or corporation." *Gripentrog*, 126 N.W.2d at 238. *See Wentz*, 103 N.W.2d at 253–54. The primary issue here is whether a municipality's engaging in urban renewal and using tax increment financing for urban renewal projects in connection with an urban renewal plan constitutes an "enterprise" under N.D. Const. art. X, § 18.

[¶ 34] Article X, § 18, N.D. Const., explicitly authorizes municipalities to engage in "any industry, enterprise or business." Although Haugland claims a municipality must be engaged in a "business enterprise" to satisfy the requirements of N.D. Const. art. X, § 18, his assertion ignores the people's use of the word "or" and three different terms in the clause for "any industry, enterprise or business." The word "or" is disjunctive and ordinarily indicates an alternative between different things or actions with separate and independent significance. *State ex rel. Stenehjem v. FreeEats.com, Inc.*, 2006 ND 84, ¶ 14, 712 N.W.2d 828. The people's use of those three different terms with the disjunctive "or" contemplates that a municipality may engage in three different types of objects or actions. *See Thompson*, 2010 ND 174, ¶ 7, 788 N.W.2d 586 (construing constitutional provision to give meaning and effect to each word and phrase). One commonly understood meaning of "business" is a particular field of endeavor or a commercial or mercantile activity engaged in as a means

of livelihood. *Merriam–Webster's Collegiate Dictionary* 167 (11th ed.2005). The same source defines "industry" to mean a systematic labor for some useful purpose or the creation of something of value, a distinct group of productive or profit-making enterprises, or a manufacturing activity as a whole. *Id.* at 638. The same source defines "enterprise" to include "a project or undertaking that is esp. difficult, complicated, or risky, ... a systematic purposeful activity." *Id.* at 416. Each of those terms has its own different meaning, which must be given effect under our rules of construction. *See Thompson,* at ¶ 7.

[¶ 35] The language of the Act authorizes a municipality to implement and undertake urban renewal plans for renewal projects within a designated renewal area. *See* N.D.C.C. §§ 40–58–03 through 40–58–07, 40–58–15. The Act explicitly requires a resolution with necessary findings after notice and a public hearing by the municipality's governing body before the municipality may exercise any of the powers conferred upon the municipality by the Act. *See* N.D.C.C. §§ 40–58–05 and 40–58–06. The Act also includes methods for financing urban renewal, including the issuance of bonds and use of tax increment financing. *See* N.D.C.C. §§ 40–58–10 and 40–58–20. The Act includes specific requirements and criteria for implementation of an urban renewal plan by a municipality's duly-elected officials. N.D.C.C. § 40–58–06. Once those requirements have been met, the language of the Act authorizes a municipality to directly engage in urban renewal and to use private and public resources to accomplish the renewal purposes of the Act. *See* N.D.C.C. §§ 40–58–03 and 40–58–04. Using the commonly understood meaning of enterprise, a municipality's implementation of an urban renewal plan under the Act by the duly-elected officials of a municipality constitutes a project or undertaking that is especially difficult, complicated, or risky, or a

systematic purposeful activity within the meaning of that term. We conclude urban renewal under the provisions of the Act constitutes an "enterprise" under N.D. Const. art. X, § 18.

[¶ 36] Haugland's reliance on *Turken v. Gordon,* 223 Ariz. 342, 224 P.3d 158, 161 (2010), is misplaced, because Arizona's gift clause provision at issue in that case, Ariz. Const. art. 9, § 7, provides that no political subdivisions "shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise" to any person or corporation. Unlike the Arizona constitutional provision at issue in *Turken,* N.D. Const. art. X, § 18, explicitly authorizes a municipality to engage in an enterprise and "to loan or give its credit or make donations" in furtherance of that enterprise. *Gripentrog,* 126 N.W.2d at 237–38; *Wentz,* 103 N.W.2d at 253–54. We conclude *Turken* is not persuasive for interpreting our constitutional provision.

[¶ 37] This Court's decisions have also recognized the interrelationship of N.D. Const. art. X, § 18, and a "public purpose" analysis under the due process clause of the 14th Amendment. *See State v. Blunt,* 2008 ND 135, ¶ 23, 751 N.W.2d 692; *Adams County Record,* 529 N.W.2d at 836 n. 1; *Gripentrog,* 126 N.W.2d at 237. Article X, § 18, N.D. Const., incorporates restrictions of the due process clause of the federal constitution and requires the use of public funds derived from taxation to be for a public purpose. *Gripentrog,* at 237. We have said a public purpose "has for its objective the promotion of public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political subdivision." *Id. See Blunt,* at ¶ 23; *Adams County Record,* at 836 n. 1. We have also recognized, however, that "where an appropriation of public funds is primarily for public purposes it is not nec-

essarily rendered violative of constitutional provisions against gifts and loans of public credit by an incidental result which may be of private benefit." *Stutsman v. Arthur,* 73 N.D. 504, 518, 16 N.W.2d 449, 454 (1944).

[¶ 38] Haugland claims Bismarck's renewal plan is not for a public purpose because it benefits only property owners within the renewal area and does not benefit *all* the inhabitants of Bismarck. We reject Haugland's narrow view of public purpose. *See Marks v. City of Mandan,* 70 N.D. 474, 484, 296 N.W. 39, 45 (1941) (construction of sewer system is general utility to entire city even though more direct and proximate benefits accrue to owners of property abutting sewer mains). This Court has recognized that a public purpose includes combating slum conditions for the benefit of not only the inhabitants therein but the public at large. *Ferch v. Housing Auth.,* 79 N.D. 764, 779, 59 N.W.2d 849, 860 (1953). One of the purposes of the Act and its authorization of renewal plans is to ultimately increase the tax base for property within the municipality's territorial limits and to provide improvements for a designated area of the municipality. We decline Haugland's invitation to hold those benefits do not accrue to all the inhabitants of the municipality and do not satisfy the public purpose requirement for due process.

[¶ 39] Other courts have held that tax increment financing for similar renewal projects constitutes a public purpose. *See State v. Miami Beach Redevelopment Agency,* 392 So.2d 875, 891 (Fla.1980) (statute authorizing redevelopment projects involving expenditure of public funds for private and commercial uses is in furtherance of public purpose); *People ex rel. City of Canton v. Crouch,* 79 Ill.2d 356, 38 Ill.Dec. 154, 403 N.E.2d 242, 248 (1980) (use of tax increment funds for redevelopment plan serves a valid public purpose);

*South Bend Pub. Transp. Corp. v. City of South Bend,* 428 N.E.2d 217, 224–25 (Ind. 1981) (urban renewal statutes further legitimate public purpose); *Richards v. City of Muscatine,* 237 N.W.2d 48, 60 (Iowa 1975) (urban renewal satisfies public purpose); *State ex rel. Tomasic v. Unified Gov't,* 265 Kan. 779, 962 P.2d 543, 552–54 (1998) (development of automobile race track facility was valid public purpose for tax increment financing); *Delogu v. State,* 1998 ME 246, ¶¶ 10–16, 720 A.2d 1153 (tax increment financing to assist private shipbuilder in modernizing and expanding facility constituted public purpose); *In re Request for Advisory Opinion,* 430 Mich. 93, 422 N.W.2d 186, 202–03 (1988) (elimination of urban blight is legitimate public purpose); *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 336–41 (Minn. 1978) (expenditure for public parking ramp constitutes public purpose); *Meierhenry v. City of Huron,* 354 N.W.2d 171, 176–77 (S.D.1984) (expenditure of tax increment funds for community redevelopment projects does not violate public purpose doctrine); *Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie,* 93 Wis.2d 392, 288 N.W.2d 85, 94–95 (1980) (use of tax increment financing to pay for public improvements and eliminate blight satisfies public purpose). *See* Annot. *Validity, Construction, and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise,* 44 A.L.R.2d 1414, 1420 (1955).

■■■ [¶ 40] The justice, wisdom, necessity, utility, and expediency of legislation are questions for legislative and not judicial determination, and we are concerned here only with the constitutionality of the Act. *See Teigen v. State,* 2008 ND 88, ¶ 7, 749 N.W.2d 505. We hold the urban renewal provisions of N.D.C.C. ch. 40–58 satisfy a public purpose for a munic-

ipality to engage in an enterprise and do not violate N.D. Const. art. X, § 18.

## V

[¶ 41] Haugland argues Bismarck's urban renewal plan violates the equal protection provisions of the federal and state constitutions. He also asserts the Act violates N.D. Const. art X, § 5, which requires all taxes be uniformly levied against the same class of property. He claims the tax collected to pay for renewal projects is not uniform in application, because property outside the renewal area is more heavily burdened by the tax than property within the renewal area. He asserts the Act and Bismarck's renewal plan serve no rational basis.

[¶ 42] Under N.D. Const. art. X, § 5, a tax must impose like burdens upon those similarly situated and not be arbitrary. *State ex rel. Haggart v. Nichols,* 66 N.D. 355, 363–72, 265 N.W. 859, 864–68 (1935). This Court has recognized the analysis under N.D. Const. art. X, § 5, is similar to the standard for equal protection under the federal constitution. *Id.* at 363, 265 N.W. at 864. In *Hamich, Inc. v. State ex rel. Clayburgh,* 1997 ND 110, ¶¶ 31–32, 564 N.W.2d 640 (citations omitted), we described the standards for equal-protection analysis of economic matters relating to taxation:

> The equal protection guarantee does not forbid classifications, but simply keeps government decisionmakers from treating differently persons who are in all relevant respects alike. Where, as here, a statute regulates social or economic matters without using suspect classifications or involving fundamental rights and is challenged on equal protection grounds, we apply the rational basis standard of review. This test has been described as "a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative

task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." We have noted the standard is especially deferential in the context of classifications made by complex tax laws.

> Under the rational basis test, a legislative classification will be upheld unless it is patently arbitrary and bears no rational relationship to a legitimate government purpose. For purposes of rational basis review, equal protection does not demand that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification; however, there must be an identifiable purpose that may conceivably or reasonably have been that of the government decisionmaker. Thus, if a reviewing court can conceive of a reason justifying the choice made by the legislature or government decisionmaker in service of a legitimate end, the statute does not violate the equal protection clause.

[¶ 43] Other courts have recognized that urban renewal projects using tax increment financing satisfy uniform tax provisions and equal protection clauses under the rational basis test. *See Richards,* 237 N.W.2d at 59–62; *Meierhenry,* 354 N.W.2d at 177–78. Chapter 40–58, N.D.C.C., and Bismarck's urban renewal plan implicate economic matters, which are subject to the rational basis test. Property owners are assessed the same property tax rate, but the Act authorizes the diversion of tax increment funds to the municipality to pay for renewal projects. We hold the levied tax is uniform on the same class of property and does not violate N.D. Const. art X, § 5. We further conclude the Act and Bismarck's plan are related to a public purpose and legitimate government objective of urban renewal. We therefore reject Haugland's claims under N.D. Const. art.

X, § 5, and the state and federal equal protection provisions.

## VI

■ [¶ 44] Haugland argues the Act violates N.D. Const. art. X, § 3, which provides, "[n]o tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." He claims Bismarck's perpetual diversion of tax increment funds violates this provision.

[¶ 45] The Act does not impose a tax. Rather, it provides for allocation and diversion of collected property taxes. As we discuss later, the Act does not authorize a perpetual diversion of tax increment funds for urban renewal. Rather, the Act authorizes a diversion "until the cost of development or renewal of the area has been reimbursed." N.D.C.C. § 40–58–20(4) and (7). *See* N.D.C.C. § 40–58–20(10). We hold N.D.C.C. ch. 40–58 does not violate N.D. Const. art. X, § 3.

## VII

[¶ 46] Haugland argues Bismarck's use of tax increment financing to fund a claimed perpetual renewal plan violates the statutory requirements of N.D.C.C. ch. 40–58.

■ [¶ 47] Statutory interpretation is a question of law, fully reviewable on appeal. *In re P.F.*, 2008 ND 37, ¶ 11, 744 N.W.2d 724. Words in a statute are given their plain, ordinary, and commonly understood meaning, unless defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1–02–02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1–02–07. If the language of a statute is clear and unambiguous, "the letter of [the statute] is not to be disregarded under the pretext of pursuing its spirit." N.D.C.C. § 1–02–05. If the language of a

statute is ambiguous, however, a court may resort to extrinsic aids to resolve the ambiguity. N.D.C.C. § 1–02–39.

■ [¶ 48] In construing N.D.C.C. ch. 40–58, we recognize a municipality is an agency of the state and has only the powers expressly conferred upon it by the legislature, or the powers necessarily implied from the powers expressly granted. *See Dakota Land Co. v. City of Fargo*, 224 N.W.2d 810, 813 (N.D.1974); *Parker Hotel Co. v. City of Grand Forks*, 177 N.W.2d 764, 768 (N.D.1970). The rule of strict construction applies to defining a municipality's powers. *Haugland v. City of Bismarck*, 429 N.W.2d 449, 453 (N.D.1988). "Once a municipality's powers have been determined, however, 'the rule of strict construction no longer applies, and the manner and means of exercising those powers where not prescribed by the Legislature are left to the discretion of the municipal authorities.'" *Id.* at 453–54 (quoting *Lang v. City of Cavalier*, 59 N.D. 75, 84, 228 N.W. 819, 822 (1930)). "Leaving the manner and means of exercising municipal powers to the discretion of municipal authorities implies a range of reasonableness within which a municipality's exercise of discretion will not be interfered with or upset by the judiciary." *Haugland*, at 454.

[¶ 49] Haugland claims Bismarck's renewal plan is perpetual and violates N.D.C.C. ch. 40–58. He asserts Bismarck may not include within its renewal area predominantly previously redeveloped property, non-blighted and non-slum property, and non-redeveloped property to generate tax increment revenue for any use Bismarck deems appropriate. He also argues Bismarck failed to follow procedural requirements and make required findings under N.D.C.C. § 40–58–06 when substantially changing its plan and failed to stop diverting tax increment funds when all the

renewal projects in the renewal area were completed.

[¶ 50] A municipality may not exercise any of its urban renewal powers under the Act until its governing body adopts a resolution finding that "[o]ne or more slum or blighted areas or industrial or commercial properties exist in the municipality" and the "development, rehabilitation, conservation, or redevelopment, or a combination thereof, of the area or properties is necessary in the interest of the public economy, health, safety, morals, or welfare" of the municipality's residents. N.D.C.C. § 40–58–05. *See City of Jamestown v. Leevers Supermarkets, Inc.,* 552 N.W.2d 365, 369 (N.D.1996).

[¶ 51] Section 40–58–06, N.D.C.C., outlines the procedure for the preparation, adoption, and revision of a "renewal plan," which is defined in N.D.C.C. § 40–58–01.1(8) to mean a plan for a renewal project which conforms to the municipality's general plan and is sufficiently complete to indicate any work as may be proposed to be carried out in the renewal area. Under N.D.C.C. § 40–58–06(1), a municipality may not approve a renewal plan for a renewal area unless the municipality's governing body by resolution decides the area is a slum area, a blighted area, or consists of industrial or commercial property, and designates the area as appropriate for a "renewal project," which is defined in N.D.C.C. § 40–58–01.1(9) to include "authorized undertakings" in a renewal area to develop commercial or industrial property or to eliminate and prevent development or spread of slums and blight. A municipality's governing body shall give notice and hold a public hearing on a renewal plan or substantial modification of an approved plan under N.D.C.C. § 40–58–06(3) and may approve the plan if the municipality makes requisite findings under N.D.C.C. § 40–58–06(4). A renewal plan may be modified at any time, but any proposed modification that will "substantially change" a previously approved plan is subject to the requirements of N.D.C.C. § 40–58–06, including the requirement of a public hearing, before approval. N.D.C.C. § 40–58–06(5).

[¶ 52] The plain language of N.D.C.C. § 40–58–06 requires a municipality to give notice and hold a public hearing before the municipality adopts a proposed modification that substantially changes a previously approved renewal plan. The ordinary meaning of "substantial" is "consisting of or relating to substance, :.. not imaginary or illusory, ... real, true, ... important, essential." *Merriam–Webster's Collegiate Dictionary* 1245 (11th ed.2005). Under that definition, we conclude a proposed modification that "substantially changes" a renewal plan means a proposed modification that changes the plan in any real, true, important or essential manner that is not imaginary or illusory. The plain language of N.D.C.C. § 40–58–06(5) subjects a proposed modification that substantially changes a previously approved plan to the requirements of N.D.C.C. § 40–58–06, which include the requirement for a resolution determining the renewal area is a slum or blighted area or consists of industrial or commercial property or a combination of those areas or properties. When that language is read together, we conclude a proposed modification substantially changing a previously approved renewal plan includes a proposed modification adding parcels of property to the renewal area. The plain language of N.D.C.C. § 40–58–06 and the definitions of slum and blighted area, however, do not require each parcel of land in the renewal area or modified renewal area to be a slum or blighted area; rather, the renewal area must consist of slum or blighted areas, or commercial or industrial property, or a combination of those properties or areas. The Act does not require every parcel of

property within a renewal area to be blighted or slum property.

[¶ 53] As relevant to the issues raised in this case, Bismarck's most recent modification of its renewal plan occurred in March 2010. That modification moved the outer boundary of the renewal area from the center of the perimeter streets to the outside edge of those streets, but did not otherwise add any parcels of property to the renewal area. We conclude that modification did not substantially change the renewal plan.

[¶ 54] The record reflects that Bismarck most recently added parcels of property to the renewal area in 2006, when it modified the renewal plan to include a total area of about 88 contiguous city blocks. Bismarck's resolution approving the modified plan stated Bismarck had determined the prior renewal area and the additional area "consist of a combination of slum and blighted areas." Bismarck's resolution complied with the procedural requirements of N.D.C.C. ch. 40–58 for a finding of slum or blighted area when it substantially changed its renewal plan in 2006. Moreover, Bismarck's determination that the prior renewal area and the additional area "consist of a combination of slum and blighted areas" is the type of decision that is within a municipality's range of discretion. See Haugland, 429 N.W.2d at 453–54.

[¶ 55] The remaining Bismarck City Commission minutes in this record reflect that when Bismarck made other modifications to its renewal plan to add parcels of property to the renewal area, Bismarck generally made findings that the prior renewal area and the additional property consist of slum or blighted property. The minutes in this record regarding the 1994 modification, which added about six city blocks to the renewal area, however, do not explicitly state that the prior renewal area and the additional property consist of slum or blighted areas. The 1994 addition of about six blocks to the renewal area constitutes a substantial change in the renewal plan. Haugland appeared at a 1994 Bismarck City Commission meeting regarding that modification and objected to the continuation of the renewal plan. This record does not reflect that Bismarck passed an appropriate resolution for the substantial change either at the original city commission meeting or at a continued meeting. Haugland's action essentially seeks to preclude the wrongful diversion of tax increment funds from the appropriate recipients and to require those recipients to receive their proper share of tax increment funds. We conclude a remand is necessary to resolve whether there was an appropriate resolution in 1994 to add the six city blocks to the renewal area. If there was not an appropriate resolution, we hold Bismarck is precluded from diverting tax increment funds for those six blocks for the period from the 1994 modification to the 2006 modification.

[¶ 56] Haugland also argues Bismarck's CORE Incentive Program allows Bismarck to gift money to non-slum and non-blighted businesses without following the procedure for adding renewal projects to its renewal plan.

[¶ 57] Bismarck's CORE Incentive Program was added to its renewal plan in 2006 and uses tax increment funds for facade and signage incentive grants, housing incentive grants, revolving loans, and sidewalk subsurface infill projects. The Act defines a renewal plan to be a plan that is sufficiently complete to indicate any work as may be proposed to be carried out in the renewal area. N.D.C.C. § 40–58–01.1(8). The Act authorizes and encourages municipalities to use private resources for voluntary rehabilitation and development of renewal areas under a renewal plan. See N.D.C.C. §§ 40–58–03

and 40–58–04. The Act grants municipalities broad authority to contract with private persons for voluntary or compulsory repair or rehabilitation of buildings and improvements. N.D.C.C. § 40–58–07(6)(d). The Act also authorizes the use of tax increment funds for those purposes. *See* N.D.C.C. § 40–58–20. As we have previously concluded, the Act authorizes a municipality to engage in the "enterprise" of urban renewal under N.D. Const. art. X, § 18, and under that constitutional provision, a municipality is authorized to make loans, extend its credit, or make donations in connection with that enterprise. This record reflects Bismarck's CORE Incentive Program is part of its urban renewal enterprise for a public purpose. We conclude the Act authorizes Bismarck to implement the CORE Incentive Program as part of an approved renewal plan.

 [¶ 58] Haugland argues Bismarck failed to properly notify the Burleigh County Auditor as required by N.D.C.C. § 40–58–20(1) and (2) for recomputing the original taxable value of the property in the renewal area for purposes of calculating the diversion of tax increment funds to Bismarck. He asserts Bismarck retained excess funds not needed to pay for any incurred obligations in its perpetual urban renewal plan in violation of N.D.C.C. § 40–58–20(10).

[¶ 59] When the district court decided this case, the relevant provisions for tax increment financing in N.D.C.C. § 40–58–20 provided, in part:

1. At any time after the governing body of a municipality has approved a development or renewal plan for any development or renewal area, it may request the county auditor and treasurer to compute, certify, and remit tax increments resulting from the development or renewal of the area in accordance with the plan and any modifications thereof, and the county auditor and treasurer shall do so in accordance with this section.

2. The auditor shall compute and certify the original taxable value of each lot and parcel of real estate in the area, as last assessed and equalized before the date of the request, including the taxable value of any lot or parcel previously acquired by the municipality or its urban renewal agency, as last assessed and equalized before it was acquired....

3. In each subsequent year, the auditor shall compute and certify the net amount by which the original taxable value of all lots and parcels of real estate in the area, as then assessed and equalized, including real estate then held by the municipality or urban renewal agency valued at zero, has increased or decreased in comparison with the original taxable value of all such real estate. The net amount of the increase or decrease is referred to in this section as the incremental value or the lost value for that year, as the case may be.

4. In any year when there is an incremental value, the auditor shall exclude it from the taxable value upon which the auditor computes the mill rates of taxes levied in that year by the state, the county, the municipality, the school district, and every other political subdivision having power to tax the development or renewal area, until the cost of development or renewal of the area has been reimbursed in accordance with this section. However, the auditor shall extend the aggregate mill rate of those taxes against the incremental value as well as the original taxable value, and the amount of taxes received from that extension against the incremental value is referred to

in this section as the tax increment for that year.

. . . .

6. The county auditor shall segregate all tax increments from the development or renewal area in a special fund, crediting to the fund, in each year when there is an incremental value, that proportion of each collection of taxes on real estate within the area which the incremental value bears to the total taxable value in that year.

7. Upon receipt of any tax increments in the fund, the county treasurer, at the times when the county treasurer distributes collected taxes to the state and to each political subdivision for which a tax loss has previously been recorded, shall also remit to each of them from the tax increment fund an amount proportionate to the amount of that tax loss, until all those tax losses have been reimbursed. Thereafter, at the time of each distribution, the county treasurer shall remit the entire balance then on hand in the fund to the municipality, until the cost of development or renewal of the area has been reimbursed to the municipality as provided in this section.

. . . .

10. When the cost of development or renewal of any development or renewal area has been fully paid and all bonds, notes, or other obligations issued by the municipality to pay that cost have been retired, or funds sufficient for the retirement thereof have been received by the municipality, the governing body shall cause this to be reported to the county auditor, who shall thereafter compute the mill rates of all taxes upon the total taxable value of the development or renewal area. Any balance then on hand in the tax increment fund must be distributed by the county treasurer to the state and all political subdivisions having power to tax property in the area, in amounts proportionate to the amounts of the tax losses previously reimbursed to them.

[¶ 60] The 2011 legislature amended N.D.C.C. § 40–58–20(1) and enacted a new subsection 12 to provide explicit time limits for the duration of tax increment financing for renewal areas and to authorize municipalities to release surplus tax increment funds to the state and appropriate political subdivisions. *See* 2011 N.D. Sess. Laws ch. 300, §§ 2 and 3. Although Bismarck claims those amendments render Haugland's claims regarding the perpetual nature of its renewal area moot, the amendments had not been enacted when the district court decided this case. The 2011 amendments specify a time for the duration of an existing renewal plan, but those amendments do not necessarily govern Haugland's claims about the termination of the renewal plan before the effective date of the legislation and his claims that Bismarck has improperly diverted tax increment funds from their lawful recipients before the legislation was enacted. Haugland's claims are not moot. *See* N.D.R.App.P. 42(c) (authorizing dismissal of issue that may have become moot because of a change in circumstances).

[¶ 61] The plain language of N.D.C.C. § 40–58–20 in effect when the district court decided this case does not require a municipality to remove property from a renewal area and recompute the taxable value of the property when individual projects have been added to the plan or completed, or when the plan has been modified. We agree with the Attorney General's 1994 interpretation of N.D.C.C. § 40–58–20, which concluded renewal

plans encompass geographic areas and not specific parcels of land. N.D. Op. Att'y Gen. 94–L–282, Oct. 17, 1994. Under N.D.C.C. § 40–58–20(3) a renewal area is treated as a whole with "all lots and parcels . . . in the area" considered for tax increment financing. The plain language of N.D.C.C. §§ 40–58–20(4) and (7) authorizes the auditor to capture tax increments "until the cost of development or renewal of the area has been reimbursed" to the municipality. Section 40–58–20(10), N.D.C.C., requires the municipality to notify the auditor "[w]hen the cost of development or renewal of any development or renewal area has been fully paid."

[¶ 62] When the language of those provisions is considered together and as a whole, we conclude those provisions authorize a municipality to use an area wide approach for renewal projects and do not require the removal of completed renewal projects from the renewal area or the recalculation of the taxable value of property within the area whenever the plan is modified. The Act gives municipalities a range of discretion to retain tax increment financing funds and to determine "[w]hen the cost of development or renewal of any development or renewal area has been fully paid." N.D.C.C. § 40–58–20(10). The Act does not limit the number of modifications to a renewal plan as long as the requirements of N.D.C.C. § 40–58–06 have been satisfied, and the effective language of N.D.C.C. § 40–58–20 provided municipalities with a range of discretion to decide when a renewal plan was completed. Nothing in the language of the Act as it existed when the district court decided this case established a specific time limit for the duration of a renewal district.

[¶ 63] Although the Act gave a municipality a range of discretion for ending renewal plans, the plain language of N.D.C.C. § 40–58–20(4), (7), and (10) au-thorizes a municipality to divert tax increment funds only "until the cost of development or renewal of the area has been reimbursed" and to end the renewal plan "[w]hen the cost of development or renewal of any development or renewal area has been fully paid and all bonds, notes, or other obligations issued by the municipality to pay that cost have been retired, or funds sufficient for the retirement thereof have been received by the municipality." The Act says a renewal project "may include authorized undertakings or activities of a municipality in a development or renewal area." N.D.C.C. § 40–58–01.1(9). Under the language of the Act, as a whole, a municipality was not authorized to continue a renewal area after the cost of development or renewal of the area was paid. That language does not contemplate a perpetual renewal plan for the diversion of tax increment funds for a renewal area without any pending authorized renewal projects under the plan. Construing those provisions as a whole, we conclude the Act authorized a municipality to continue a renewal plan for a renewal area with tax increment funding until "the cost of development or renewal of any development or renewal area has been fully paid and all bonds, notes, or other obligations issued by the municipality to pay that cost have been retired, or funds sufficient for the retirement thereof have been received by the municipality." N.D.C.C. § 40–58–20(10).

[¶ 64] Haugland claims Bismarck's renewal plan for the renewal area was completed and there were no pending authorized renewal projects within the area when the district court decided this action. Although Bismarck claims several large projects were under consideration when Haugland brought this action, the record does not reflect whether there were any authorized renewal projects in the renewal area when the district court decided this case. We are unable to determine from

the summary judgment record in this case whether Haugland's claims are true. We therefore conclude a remand is necessary to resolve that factual issue and, if appropriate, for allocation of diverted tax increment funds to the proper recipients in accordance with N.D.C.C. § 40–58–20(10).

## VIII

[¶ 65] We affirm in part, reverse in part, and remand for further proceedings.

[¶ 66] GERALD W. VANDE WALLE, C.J., WILLIAM W. McLEES, D.J., DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.

[¶ 67] The Honorable William W. McLees, D.J., sitting in place of Kapsner, J., disqualified.