2014 ND 51

**Erling "Curly" HAUGLAND,
Plaintiff and Appellant**

v.

**CITY OF BISMARCK, Defendant
and Appellee.**

**No. 20130100.**

Supreme Court of North Dakota.

March 14, 2014.

Monte L. Rogneby (argued) and Amanda E. Peterson (on brief), Bismarck, N.D., for plaintiff and appellant.

Randall J. Bakke, Bismarck, N.D., for defendant and appellee.

CROTHERS, Justice.

[¶ 1] Erling "Curly" Haugland appeals from a summary judgment dismissing his action against the City of Bismarck for declaratory relief involving Bismarck's implementation of an urban renewal plan and

use of tax increment financing to fund renewal projects in its renewal area. In *Haugland v. City of Bismarck*, 2012 ND 123, ¶¶ 55, 64, 818 N.W.2d 660, we remanded for further proceedings to resolve: (1) whether Bismarck adopted an appropriate resolution in 1994 to add six city blocks to its renewal area; and (2) whether Bismarck had any pending authorized renewal projects in the renewal area when the district court decided the case in January 2011. On remand, the district court decided an appropriate 1994 resolution existed to add six city blocks to the renewal area and authorized renewal projects in the renewal area were pending in January 2011. We affirm summary judgment concluding Bismarck's urban renewal plan included pending authorized projects for the existing renewal area when the district court decided the case in January 2011. We reverse and remand summary judgment concluding no disputed issues of material fact exist regarding approval of the 1994 plan.

## I

[¶ 2] Haugland sued Bismarck, alleging its adoption of an urban renewal plan and use of tax increment financing to fund renewal projects within its downtown renewal area violated the state and federal constitutions and North Dakota urban renewal law under N.D.C.C. ch. 40–58. After the district court initially granted Bismarck's motion for summary judgment, we held the statutory provisions authorizing tax increment financing were constitutional. *Haugland*, 2012 ND 123, ¶ 1, 818 N.W.2d 660. We also construed relevant statutory provisions in N.D.C.C. ch. 40–58 and held the record did not establish whether Bismarck's renewal plan complied with two requirements of that chapter. *Haugland*, at ¶¶ 55, 64. We remanded for further proceedings to determine whether Bismarck passed an appropriate resolution

in 1994 to substantially modify its renewal plan and to determine whether Bismarck had any pending authorized renewal projects within the renewal area in January 2011. *Id.*

[¶ 3] On remand, the district court again granted Bismarck's motion for summary judgment, concluding Bismarck passed an appropriate resolution at a continued public hearing in November 1994 to modify its renewal plan after finding the modified renewal area consisted of slum or blighted areas. The court also determined Bismarck had pending authorized renewal projects within the renewal area in January 2011, including a parking ramp, a quiet rail zone, and the CORE Incentive Program.

## II

[¶ 4] The district court decided the remanded issues by summary judgment, "which is a procedural device for promptly resolving a controversy on the merits without a trial if there are no disputed issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law." *Haugland*, 2012 ND 123, ¶ 21, 818 N.W.2d 660. " 'A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.' " *Hamilton v. Woll*, 2012 ND 238, ¶ 9, 823 N.W.2d 754 (quoting *Wenco v. EOG Res., Inc.*, 2012 ND 219, ¶ 8, 822 N.W.2d 701). " 'In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record.' " *Wenco*, at ¶ 8 (quoting *Arndt v. Maki*, 2012 ND 55, ¶ 10, 813 N.W.2d 564).

" 'On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law.' " *Hamilton,* at ¶ 9 (quoting *Wenco,* at ¶ 8). " 'Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.' " *Wenco,* at ¶ 8 (quoting *Arndt,* at ¶ 10).

## III

■ [¶ 5] Haugland argues Bismarck failed to establish as a matter of law that it complied with the procedural requirements of N.D.C.C. § 40–58–06 for substantially modifying its urban renewal plan in 1994. He claims Bismarck failed to establish it provided proper notice of a public hearing for the November 1994 modification of its renewal plan. He also claims Bismarck failed to establish it made a finding by official resolution that slum or blighted areas exist within the specific renewal area. He asserts that Bismarck must provide a complete copy of the governing body's official resolution under N.D.C.C. § 31–09–10(4) to establish the resolution passed, and that providing only the first page of the resolution and an affidavit expressing a city administrator's "belief" a full resolution was adopted was legally insufficient. Bismarck responds it passed an appropriate resolution in 1994 to modify its renewal plan and asserts it provided adequate documentation to establish adoption of the resolution even though it was able to locate only one of two pages of the official city resolution.

[¶ 6] Under N.D.C.C. § 40–58–05, a municipality may not exercise any of its urban renewal powers until its governing body adopts a resolution finding that "[o]ne or more slum or blighted areas or industrial or commercial properties exist in the municipality" and the "development, rehabilitation, conservation, or redevelopment, or a combination thereof, of the area or properties is necessary in the interest of the public economy, health, safety, morals, or welfare" of the municipality. Section 40–58–06, N.D.C.C., describes the procedure for preparing, adopting, and revising a "renewal plan." Under N.D.C.C. § 40–58–06(1), a municipality may not approve a "renewal plan" for a "renewal area" unless the municipality's governing body by resolution decides the area is a slum area, a blighted area, or consists of industrial or commercial property, and designates the area as appropriate for a "renewal project." A municipality's governing body shall give notice and hold a public hearing on a renewal plan or a substantial modification of a previously approved renewal plan. N.D.C.C. § 40–58–06(3). Following the hearing, the governing body may approve a renewal plan if it makes requisite findings under N.D.C.C. § 40–58–06(4). A renewal plan may be modified at any time, but any proposed modification that "substantially change[s]" a prior renewal plan is subject to the requirements of N.D.C.C. § 40–58–06. N.D.C.C. § 40–58–06(5). In *Haugland,* 2012 ND 123, ¶¶ 52, 55, 818 N.W.2d 660, we concluded the "plain language of N.D.C.C. § 40–58–06 requires a municipality to give notice and hold a public hearing before the municipality adopts a proposed modification that substantially changes a previously approved renewal plan," and Bismarck substantially changed its renewal plan in 1994 when it added six city blocks to the renewal area.

[¶ 7] In *Haugland,* we described the record pertaining to Bismarck's 1994 modification of its renewal plan:

"In August 1994, after notice and a public hearing, Bismarck considered a proposal to modify its renewal area to include an additional contiguous area. Haugland appeared at the Bismarck

City Commission meeting and protested the proposed modification of the plan, claiming all debt for the previously approved plan had been paid and the plan must be discontinued. Bismarck sought an Attorney General's opinion, asking if 'N.D.C.C. § 40–58–20(10) requires a city to remove an individual parcel from . . . an urban development or renewal area after any tax increment-financed improvements to the specific parcel have been individually completed and any tax increment-financed obligations with respect to such parcels have been repaid.' The Attorney General opined 'that N.D.C.C. § 40–58–20(10) does not authorize a city to remove individual parcels from an urban development or renewal area after tax increment-financed improvements to the specific parcel have been individually completed and paid.' N.D. Op. Att'y Gen. 94–L–282, Oct. 17, 1994. After a continued public hearing in November 1994, Bismarck modified its renewal plan to add about six additional contiguous city blocks to the renewal area. The 1994 modified plan generally identified the same proposed renewal actions as the earlier plans and identified the same items for acquisition and construction within the renewal area."

2012 ND 123, ¶ 11, 818 N.W.2d 660.

[¶ 8] On that record, we remanded for the district court to resolve whether an appropriate resolution existed in 1994 to add the six city blocks to the renewal area:

"The minutes in this record regarding the 1994 modification, which added about six city blocks to the renewal area, however, do not explicitly state that the prior renewal area and the additional property consist of slum or blighted areas. The 1994 addition of about six blocks to the renewal area constitutes a substantial change in the renewal plan.

Haugland appeared at a 1994 Bismarck City Commission meeting regarding that modification and objected to the continuation of the renewal plan. This record does not reflect that Bismarck passed an appropriate resolution for the substantial change either at the original city commission meeting or at a continued meeting. Haugland's action essentially seeks to preclude the wrongful diversion of tax increment funds from the appropriate recipients and to require those recipients to receive their proper share of tax increment funds. We conclude a remand is necessary to resolve whether there was an appropriate resolution in 1994 to add the six city blocks to the renewal area. If there was not an appropriate resolution, we hold Bismarck is precluded from diverting tax increment funds for those six blocks for the period from the 1994 modification to the 2006 modification."

*Haugland*, 2012 ND 123, ¶ 55, 818 N.W.2d 660.

[¶ 9] On remand, Bismarck provided additional documentation for the 1994 modification of its renewal plan, including a November 9, 1994, memorandum from its city administrator stating "On Tuesday, November 8, 1994, the Board of City Commissioners held a continuation of the Public Hearing on the modification of the Bismarck Urban Renewal Plan. Action by the Board was to approve the Plan as attached." Bismarck also provided the first page of a resolution stating the described area consisted of "slum and blighted areas." Bismarck represented that "[d]espite diligent inquiry, [it was] unable to locate the second page of the subject Resolution," but submitted an affidavit of its city administrator stating his "belief and recollection" that during the normal course of business "the Bismarck City Commission passed the subject Resolution and

made the findings of the existence of slum and blighted areas within the renewal area during the November 8, 1994 Commission meeting when the 1994 modifications to Bismarck's Plan [were] approved."

[¶ 10] As we recognized in our prior decision, Bismarck considered the proposal to add the six blocks to the renewal area after notice and a public hearing in August 1994, but continued consideration of the matter until a November 1994, public hearing. *Haugland*, 2012 ND 123, ¶ 11, 818 N.W.2d 660. Section 40–58–06(4), N.D.C.C., authorizes the governing body of a municipality to make findings "[f]ollowing the hearing," and no authority is cited precluding Bismarck from adopting the substantially modified renewal plan at the November 8, 1994 continued public hearing.

[¶ 11] Section 31–09–10(4), N.D.C.C., says a municipality's acts "may be proved" by "a copy of the official record of such acts, certified by the legal keeper thereof, or by a printed book purporting to be published by the authority of such corporation and to contain a record of such acts." However, that statute does not prescribe the exclusive method of establishing a municipality's actions. *See Harmening v. Howland*, 25 N.D. 38, 43, 141 N.W. 131, 133 (1913) (recognizing statutory language prescribes method by which proof may be made, but statutory methods of proof are not intended to be exclusive). Rule 1005, N.D.R.Ev., permits proof of public records by "other evidence of the contents" of a public record in the absence of a copy of the official document.

[¶ 12] Bismarck provided documentary evidence indicating it held a continuation of a properly noticed public hearing on the modification of the renewal plan on November 8, 1994, which resulted in the addition of the six block area to the renewal area after Bismarck made find-

ings that the renewal area consisted of slum and blighted areas. However, Bismarck did not provide a complete copy of the resolution. Under N.D.C.C. § 31–11–03(15), there is a disputable presumption that an official duty has been performed regularly, which may be contradicted. *See Wilson v. Divide Cnty.*, 76 N.W.2d 896, 900–01 (N.D.1956); *Coulter v. Ramberg*, 79 N.D. 208, 213–14, 55 N.W.2d 516, 518 (1952).

[¶ 13] The district court granted Bismarck summary judgment, meaning Haugland was entitled to all inferences favorable to him, including all inferences unfavorable to Bismarck, in relation to Bismarck's claim it cannot find the crucial page of its official public record. *See Wenco*, 2012 ND 219, ¶ 8, 822 N.W.2d 701 (viewing summary judgment evidence in light most favorable to nonmoving party). Because of this procedural posture, we conclude summary judgment on this issue was not appropriate.

[¶ 14] The city administrator stated his "belief and recollection" that during the normal course of business, "the Bismarck City Commission passed the subject Resolution[.]" But Bismarck has been unable to locate documentation proving this actually occurred, or that the resolution approved any or all of the property in the six square blocks at issue. This Court has recognized the failure of a party to produce evidence within its knowledge and control, which has an important bearing on disputed facts, can warrant an inference the evidence would be unfavorable. *See Colgate–Palmolive Co. v. Dorgan*, 225 N.W.2d 278, 281 (N.D.1974); *Krueger v. North Am. Creameries*, 75 N.D. 264, 273–74, 27 N.W.2d 240, 244 (1947).

[¶ 15] In granting summary judgment for Bismarck, the district court said Bismarck presented circumstantial ev-

idence to establish it adopted a resolution to modify the renewal plan at its November 8, 1994 meeting. The court effectively weighed the evidence and drew inferences in favor of Bismarck. When reasonable competing inferences exist, however, the non-moving party in a summary judgment motion is entitled to the benefit of the permissible inferences and summary judgment is inappropriate:

> " 'This Court has repeatedly held that summary judgment is inappropriate if the court must draw inferences and make findings on disputed facts to support the judgment.' This is what the district court did in this case. The evidence before the court permits reasonable inferences that support the positions of both sides in this controversy."

*Hamilton*, 2012 ND 238, ¶ 13, 823 N.W.2d 754 (citation omitted). On appeal from a grant of summary judgment, we view the evidence in a light most favorable to the party against whom the summary judgment was granted, and give that party the benefit of all inferences that can reasonably be drawn therefrom. *Wenco*, 2012 ND 219, ¶ 8, 822 N.W.2d 701. Summary judgment is inappropriate when one can draw reasonable inferences that support the positions of both sides in a controversy and a fact-finder could draw negative inferences from the absence of documentation or records in this case. *See Wenco*, at ¶ 8. We conclude summary judgment was inappropriate on this issue. We therefore reverse the district court's conclusion that Bismarck established an appropriate resolution to add the six city blocks to the renewal area, and we remand for further proceedings on this issue.

## IV

[¶ 16] Haugland argues Bismarck failed to establish pending authorized renewal projects existed within the renewal area in January 2011, to support the continued diversion of property taxes from the normal property tax recipients to Bismarck's tax increment financing fund. Haugland claims N.D.C.C. ch. 40–58 creates a two-step process for the diversion of tax increment funds from the normal property tax recipients to a municipality for urban renewal projects: (1) the official adoption of a specific renewal plan and renewal project; and (2) a specific determination of the manner of funding the project either by tax increment financing or by tax breaks. He contends the quiet rail zone, the parking ramp and the CORE Incentive Program are not authorized projects because Bismarck did not establish it separately approved those projects, or that it separately approved tax increment financing for any of those projects. Bismarck responds the CORE Incentive Program, the parking ramp and the quiet rail zone were "authorized" by its March 9, 2010 renewal plan and were pending when the district court initially decided this case in January 2011.

[¶ 17] Our remand on this issue in *Haugland* was in the context of analyzing arguments that Bismarck's claimed perpetual renewal plan violated N.D.C.C. ch. 40–58 and that Bismarck was required to stop diverting tax increment funds when all the renewal projects in the renewal area were completed:

> "The Act gives municipalities a range of discretion to retain tax increment financing funds and to determine '[w]hen the cost of development or renewal of any development or renewal area has been fully paid.' N.D.C.C. § 40–58–20(10). The Act does not limit the number of modifications to a renewal plan as long as the requirements of N.D.C.C. § 40–58–06 have been satisfied, and the effective language of N.D.C.C. § 40–58–20 provided municipalities with a range of discretion to decide when a renewal plan

was completed. Nothing in the language of the Act as it existed when the district court decided this case establatished a specific time limit for the duration of a renewal district.

"Although the Act gave a municipality a range of discretion for ending renewal plans, the plain language of N.D.C.C. § 40–58–20(4), (7), and (10) authorizes a municipality to divert tax increment funds only 'until the cost of development or renewal of the area has been reimbursed' and to end the renewal plan '[w]hen the cost of development or renewal of any development or renewal area has been fully paid and all bonds, notes, or other obligations issued by the municipality to pay that cost have been retired, or funds sufficient for the retirement thereof have been received by the municipality.' The Act says a renewal project 'may include authorized undertakings or activities of a municipality in a development or renewal area.' N.D.C.C. § 40–58–01.1(9). Under the language of the Act, as a whole, a municipality was not authorized to continue a renewal area after the cost of development or renewal of the area was paid. That language does not contemplate a perpetual renewal plan for the diversion of tax increment funds for a renewal area without any pending authorized renewal projects under the plan. Construing those provisions as a whole, we conclude the Act authorized a municipality to continue a renewal plan for a renewal area with tax increment funding until 'the cost of development or renewal of any development or renewal area has been fully paid and all bonds, notes, or other obligations issued by the municipality to pay that cost have been retired, or funds sufficient for the retirement thereof have been received by the municipality.' N.D.C.C. § 40–58–20(10).

"Haugland claims Bismarck's renewal plan for the renewal area was completed and there were no pending authorized renewal projects within the area when the district court decided this action. Although Bismarck claims several large projects were under consideration when Haugland brought this action, the record does not reflect whether there were any authorized renewal projects in the renewal area when the district court decided this case. We are unable to determine from the summary judgment record in this case whether Haugland's claims are true. We therefore conclude a remand is necessary to resolve that factual issue and, if appropriate, for allocation of diverted tax increment funds to the proper recipients in accordance with N.D.C.C. § 40–58–20(10)."

2012 ND 123, ¶¶ 62–64, 818 N.W.2d 660.

[¶ 18] The CORE Incentive Program, quiet rail zone, and parking ramp were specifically identified in Bismarck's March 9, 2010, "Official Urban Renewal Plan" under a heading for "proposed renewal actions." The March 2010 modified urban renewal plan said "[n]ew improvements will also embrace as much of a skyway system as financially possible, parking structures, and quiet rail improvements" and explicitly identified "Construction of a public parking ramp ... Construction of Quiet Rail facilities at surface crossings within the Urban Renewal Plan area," and the CORE Incentive Program as "[s]pecific items involving City acquisition and construction within the Revised Urban Renewal Area."

[¶ 19] A "development or renewal plan" means "a plan for a development or renewal project" which "[i]s sufficiently complete to indicate any land acquisition, development, demolition and removal of structures, redevelopment, improvements, or rehabilitation as may be proposed to be

carried out in the development or renewal area." N.D.C.C. § 40–58–01.1(8)(b). Although Haugland claims the "proposed renewal actions" in the renewal plan were a "wish list," Bismarck's March 9, 2010, modified official urban renewal plan explicitly identified the parking ramp, the quiet rail zone, and the CORE Incentive Program as projects "proposed to be carried out" within the meaning of a "renewal plan" under N.D.C.C. § 40–58–01.1(8)(b). The exact parameters of those projects were not yet identified in Bismarck's modified renewal plan, but the identification of those specific renewal actions in the renewal plan was "sufficiently complete" to authorize those projects.

[¶ 20] Haugland reads the urban renewal law too narrowly when he claims Bismarck was required to separately authorize a specific project and use of the tax increment funds for the particular project for the project to be authorized. "At any time after" Bismarck approved the March 2010 modified renewal plan, it was entitled to request the county auditor and treasurer to compute and remit tax increments resulting from the renewal of the area in accordance with the plan and any modifications. N.D.C.C. § 40–58–20(1). That statutory language authorized Bismarck to have tax increment funds diverted from the normal property tax recipients after Bismarck approved the renewal plan and Bismarck was authorized to continue to have tax increment funds diverted until it determined the cost of the renewal area was reimbursed and fully paid. *See* N.D.C.C. § 40–58–20(4), (7) and (10). *See also Haugland,* 2012 ND 123, ¶ 64, 818 N.W.2d 660 (holding N.D.C.C. ch. 40–58 authorizes an area wide approach for urban renewal). For purpose of diverting tax increment financing funds, a renewal project is authorized when it is included in a duly adopted renewal plan. As we explained in *Haugland,* at ¶ 62, the urban renewal statutes give "municipalities a range of discretion to retain tax increment financing funds and to determine '[w]hen the cost of development or renewal of any development or renewal area has been fully paid.'"

[¶ 21] Bismarck presented documentary evidence on remand to establish as a matter of law that the quiet rail zone, the parking ramp and the CORE Incentive Program were authorized projects under the March 2010 modified renewal plan, which had not been terminated in January 2011 and which authorized ongoing diversion of tax increment funds on an area wide approach under N.D.C.C. § 40–58–20(1). Bismarck established it was pursuing the quiet rail zone and parking ramp projects in January 2011, which were pending authorized projects under the March 2010 renewal plan. Bismarck's evidence established that in January 2011, it had not completed everything in the March 2010 plan it proposed to complete, nor had it had diverted enough money to pay for all projects identified in its renewal plan. The March 2010 renewal plan said the cost of completion of the renewal area contemplated use of tax increment funds, and this Court's decision construed the urban renewal statutes to permit an area wide approach for renewal projects. *Haugland,* 2012 ND 123, ¶ 62, 818 N.W.2d 660. Under N.D.C.C. § 40–58–20(1), "[a]t any time after" Bismarck approved the renewal plan, it was entitled to have tax increment funds diverted from the normal property tax recipients and it had not exercised its discretion to determine the cost of the renewal area had been reimbursed or fully paid. We conclude those ongoing projects were authorized by Bismarck's March 9, 2010, renewal plan and the district court did not err in deciding Bismarck had pending authorized renewal

projects in its existing renewal plan in January 2011.

## V

[¶ 22] We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

[¶ 23] MARY MUEHLEN MARING, S.J., William W. McLEES, D.J., GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, and DANIEL J. CROTHERS, JJ., concur.

[¶ 24] The Honorable WILLIAM W. McLEES, D.J., sitting in place of KAPSNER, J., disqualified.

[¶ 25] The Honorable LISA FAIR McEVERS was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge MARY MUEHLEN MARING, sitting.

SANDSTROM, Justice, concurring.

[¶ 26] I agree that because this case is here on summary judgment and Haugland was entitled to all inferences favorable to him, including all inferences unfavorable to the City, in relation to the City's claim it cannot find the crucial page of its official public record, summary judgment was not appropriate. The missing page would disclose whether the six square blocks—in whole or in part—were properly added to the renewal area in 1994.

[¶ 27] I write separately to note that decisions in other states are consistent with the result reached by our Court here and offer additional insight.

[¶ 28] When a document is lost or unaccounted for and a party is not at fault for the loss, a fact-finder should draw no unfavorable inference. Nevertheless, the question of fault is a question for the fact-finder:

Juries should judge credibility issues. If a jury concludes that a missing document was genuinely lost and that the document's absence is not brought about by manipulation, then the jury should draw no inference against the non-producing party that the document would have been unfavorable.

The circumstances surrounding the missing nursing assessment form created a jury issue.

*Richardson v. Miller,* 44 S.W.3d 1, 28–29 (Tenn.Ct.App.2000) (citations omitted). "If you find ... the defendant intentionally lost or destroyed them to keep the information secret, you may draw an unfavorable inference.... However, if you find there was an innocent explanation for the missing records or documents, ... you may not draw such an inference." *Murray v. Developmental Servs. of Sullivan Cnty., Inc.,* 149 N.H. 264, 271, 818 A.2d 302, 309 (2003).

[¶ 29] In some cases, there is clearly an innocent explanation for missing documents. "For example, where the evidence is positive that the hospital had been destroyed by fire, such circumstance would adequately account for the loss of the original medical record without fault attributable to the hospital, and there would be no reason for the jury to be instructed on a presumption or inference arising from the loss." *Wuest ex rel. Carver v. McKennan Hosp.,* 2000 SD 151, ¶ 12, 619 N.W.2d 682. Nevertheless, a statement of "belief," such as was provided in this case, is insufficient to prove a vote took place and is an issue which must go to a fact-finder:

The Town cannot survive a motion for summary judgment merely by offering evidence that the board members had "reason to believe" that they had formally taken action. Moreover, we cannot credit the board members' mere assertion, unsupported by any documentation,

that such a vote took place. *Cf.* Wis. Stat. § 60.33(2) (clerk responsible for attending meetings and keeping a full record of proceedings); *Walsh v. State,* 180 Wis. 356, 358, 192 N.W. 1004 (1923) (circuit court in error for allowing clerk to give oral testimony about whether board had granted liquor license when clerk had duty to record proceedings, no documentation existed, and absence of such documentation had not been accounted for); *Chippewa Bridge Co.,* 122 Wis. at 103, 99 N.W. 603 ("[I]t is doubtful whether evidence from several interested persons should be held sufficient" to rebut the presumption that the absence of a record indicates a lack of proceedings.).

*Town of E. Troy v. Vill. of E. Troy,* 2005 WI App 233, 287 Wis.2d 829, 705 N.W.2d 906.

[¶ 30] Relative to a missing corporate document, a Minnesota court held similarly:

Based on the imperfect record, there is a genuine issue of material fact regarding when this write-off occurred.... Respondents are in the best position to produce evidence on this issue and yet they have presented no documentary evidence of when the loan write-off occurred. Respondents' accountant signed an affidavit stating that he is "of the opinion" that the cab companies have followed all corporate formalities and have "maintained adequate and normal business records." His affidavit goes on to state the [sic] he prepared year-end balance sheets and profit and loss statements for the cab companies but that he "cannot presently locate [his] file." A reasonable finder of fact could draw a negative inference from respondents' failure to produce corporate records to definitively demonstrate when the loan write-off occurred. Therefore, summary adjudication of this claim was improper.

*Rydrych v. GK Cab Co., Inc.,* A13–0227, 2013 WL 5976078, at *6 (Minn.Ct.App. Nov. 12, 2013) (citation omitted).

[¶ 31] The city administrator in this case stated he believes that during the normal course of business, "the Bismarck City Commission passed the subject Resolution[.]" Nevertheless, Bismarck says it is unable to locate documentation proving this actually occurred. Summary judgment is inappropriate when one can draw reasonable inferences that support the positions of both sides in a controversy and a fact-finder could draw negative inferences from the absence of documentation or records in this case. *See Vill. of E. Troy,* 2005 WI App 233, 287 Wis.2d 829, 705 N.W.2d 906 ("[W]e cannot credit the board members' mere assertion, unsupported by any documentation, that such a vote took place.").

[¶ 32] I agree we must reverse the district court's conclusion that Bismarck established an appropriate resolution to add the six city blocks to the renewal area.

[¶ 33] Dale V. Sandstrom